Thank you very much. Your honor, may I reserve a minute in rebuttal? Say again? May I reserve a minute in rebuttal? Yes you may. Thank you. May it please the court, the decision in Carpenter v. United States has changed the legal landscape regarding the government's warrantless access to records stored by an electronic communications provider. The information provided to the police, in this case by the location of the user of the Rusty Hood account on multiple specific dates and times. How are those records any different from a record of one's telephone calls? Yes, your honor, I believe they're significantly different. How? The Smith case involved a pen register and... I know what the Smith, but... You took the telephone... You don't doubt that the government can get a record of your telephone calls without a telephone company. Yes, but you give that number to them and ask them if you'll make that connection. You don't give your IP address knowingly when you use one of these mobile applications. It just happens. They record it. They could use it for the sake of the exchange of information between the two parties on that one occasion without having to record that. Plus, when you apply with KIC, you're on the Internet and you just trigger the use of the application on your mobile phone. It's not providing them with a telephone number. It's not providing them voluntarily or knowingly with your IP address. They record that. They capture it. That's different than... But you used the word, allow you to get the location? Yes. But I thought in Carpenter, it gave the location. So that's a difference, right? I don't think so, Your Honor, because you still would have to have, if you're the police, apply to some sort of registry or list or index to see, okay, tower number 58C in zone X. Well, where's that? You have to go to... And once I find that out, I know the location, though. The same as when you go to the service provider with an IP address, you say, oh, now I know where that comes from. I go to that provider like Sprint or Frontier or MetroCast, Cable, whatever, and they give you the physical address. And it's not just a tower. It's an actual street number, a house, a specific computer at a very specific location. And it's only at the moment you send it, correct? Well, yes, it's through your use of that application. But with respect to the location data in Carpenter, even if you didn't make a call, you still could be sending the signal that would give the information about where you were, correct? That does depend on what sort of programs are downloaded into the phone. There are some that make automatic connections. And wasn't that part of Carpenter's concern? I think it was part of it. So why is that difference not itself significant? Well, I think the real gauge is not so much the number of connections. I thought that was critical to Carpenter, that you could get this consistent, constant. And didn't they analogize it to somebody tailing you at all times? Yes, but I think it was... Because it would only be episodic when you sent the... It could be used, I believe, Your Honor, to tail somebody in real time. I think it's typically used. How could that be? They would get with kick and say, okay, it's another application made, another application. Now we know he's here, now we know he's there. They could go and get the IP address. It depends on your use. It would depend on the subject's use of his computer. As the same in Carpenter. No, it wasn't the same in Carpenter. Well, they don't necessarily... The cell phone allows you to track whether or not the phone itself is being used. Well, there's a GPS unit. That wasn't what was happening in Carpenter. Independent of the GPS unit, because the cell phone, independent of you making any call or sending any text, emits the location data to the cell phone tower. So that enables a kind of tailing that's just not possible under kick. It depends on the programs that are in play with the particular cell phone user. Did Carpenter operate on the understanding that the cell phone in question was of that type? My understanding with Carpenter is that it was the period of turning that was of real relevance to the court. They focused on a seven-day period. Yeah, but during that seven-day period, wasn't it constantly emitting? That's why the court was able to say it was tailing. There were numerous more automatic re-ups that provided location data. There are zero automatic re-ups in this technology, correct? Yes. Okay, so that's the key. That is a difference. So how come that is not a difference that matters? Well, we don't really know, because there was no evidence allowed by the court, how many occasions to exactly... No, that was not... We don't know how many points of data to extract from this. That was not my question? Yes. There are zero automatic emissions with this technology? I believe that's correct, Your Honor. Okay, so why does that not make this technology different from the technology in Carpenter? Your Honor, I would suggest it's a distinction without a real difference under the Fourth Amendment analysis, because I think it's the historical, over a period of time, are you able to track the comings and goings? Now, let's say in Carpenter that somebody's phone re-ups as they sit in a restaurant for five hours. It's going to get data, data, data. It's all the same. It's a question of movement to different locations, multiple addresses. Here we got evidence of a particular motel. The police were able to go there and find out that this defendant had registered in a room at that motel, on the date and at the time of that Internet connection. And if the police, under the pen register scheme, get the number of the motel on the pen register, it can go to the motel and do exactly what you say is significant here. But with the pen register, it's one landline phone. Here, it's a mobile phone that goes from place, pillar to post, and all they need to do is track the application and go to get the records from KIC, and it will have several different physical locations that that person went to, not just the phone calls that they made or what they did while they were on the application, but it will have his movements and specific addresses. With Carpenter, you had a generalized, here's a cell tower in this location. With KIC, you had the address of his grandmother's home. You had the address of the motel at which he stayed, which they were able to confirm when they went there. So it's beyond just a generalized what tower you're connecting to. It's a more precise. And there are dates and times associated with each one of those connections. So somebody with a mobile phone could be moving around in different locations, and you're going to be able to get those locations. No, you won't. You get the IP addresses of the connections? No, you will only do it if he sends something. Yes, I agree with that, Your Honor, but... That's not true in Carpenter. No, but... So that's pretty different. It depends on the user and it depends on the phone, and that's true in Carpenter, but here you get much more precise information and address, not just a tower. That's a little bit different. Well, can't you do exactly the same thing today once you get the telephone number? It's just one more step. I'm not sure I understand the question, Your Honor. Well, I assume that there is a way, maybe it involves going through the telephone company, I don't know, but a way to know the address of the telephone that was called, the number of which shows up on the pen register. It's just one more step. The type of phone we're talking about is really more akin to a mobile personal computer. It doesn't necessarily involve use of a telephone number at all. It's a direct Internet connection. No, I realize that you are talking about different references from merely a telephone number, but those references are, in your view, significant because of where they lead and the telephone number in the pen register is significant because of where it can lead, and so ultimately I don't see what the difference is. Well, I think there's a much more conscious choice of providing the telephone number and it's an incidental, sometimes unknowing act that the service provider is actually capturing an IP address where you're making an Internet connection. How can you say that? The person who's making the telephone call almost by definition doesn't know the pen register is in place. No, but they know. He's just using the telephone number in the ordinary course of his activities. But they know. The person who's using the computer is using the computer in the course of his normal activities. He's not aware that those, any more than the person using the telephone, that there's going to be. He may not be aware of the pen register, but he knows he's giving the number to the phone company. He's dialing it. He knows he's giving it to them. When you use your Internet connection, you don't know that the service provider is capturing the address. The IP address available to the kid. I mean, they couldn't transmit it if they didn't have the address. I'm not sure, Your Honor. I don't know if they need to capture it for that particular transaction. That was not part of the evidence here. But I can tell the court that I don't view that they're capturing it and recording it for posterity. I think those are two separate issues. Any more than you know what the telephone company is capturing and recording, you know they have the potential to capture and record it, but the pen register is still lawful. Just like the Internet provider has the potential to capture and record the IP address when you choose to send transmissions through their company or through that website. Your Honor, I would like to move on to the second issue. Okay. In this case, it had been provided to the court in the sealed addendum, actual reports from multiple polygraph examinations, two of them. And it's got a list of the specifics. How long a sentence does the defendant have? Five years. Yeah. And so why should we decide this question now? We've got to wait until he's actually on supervised release. At that point, we've got to wait for a probation officer to determine whether sex offender treatment in his case will actually include a polygraph. And if it does, then we have to confront the question of how that polygraph examination will relate to the defendant's Fifth Amendment rights. So why should we decide this in a vacuum before we have an actual case, particularly when we know the district court has a continuous power of supervision over supervised release conditions? Your Honor, I don't think it's an appropriate way to approach the question of letting the violation occur first. What's the violation? The violation of his Fifth Amendment right. But I thought the whole point is that we wouldn't know that there was one until we understood what question was being asked and what use was being made of the answer. I think, Your Honor, even threatened sanctions are enough to trigger the right, and it certainly is here, because if it's certainly testimonial, it's compelled. But on the incrimination question, even if it's threatened that there will be a penalty for the exercise of his right or— Where does that threat appear? Because the contract makes it a termination event if a person asserts a Fifth Amendment right during the course of one of these polygraph exams. It's not that you go to the court and do a revocation motion on the petition because of the assertion of the right, but you get terminated from the sex offender treatment program, and that, in and of itself, is an independent basis, and that can trigger a revocation. But doesn't the standard order to take the polygraph test provide that a refusal to answer a question will not be held against one, but if one does answer, that whatever the answer is could be used as evidence in a separate criminal case? Only if it's the sole basis, but here, the way it has worked is that the assertion of the right leads to a termination from the therapy, and that's the basis for the revocation. But you don't have a Fifth Amendment right in that circumstance. The Fifth Amendment right is from the criminal punishment. Yes, but all of the questions, Your Honor, the list of them, and if you go through the exam report, the majority of them are specifically directed to new criminal conduct. That's what they're inquiring of him on the largest scale is brand-new criminal conduct. Before you sit down, let me get this straight. The only burden that you've identified that follows from an assertion of a Fifth Amendment right, as against any of those questions, is termination of the treatment, not revocation of the supervised release, right? But then the termination is the basis for the revocation, and that's been what has happened. Is that automatic? It can be automatic, that the assertion of the right. It can be? Yes. That sounds like not automatic. I think that a counseling company that's hired by the probation department has some flexibility with what they're going to do, but it is a termination event right in the contract, and certainly that would be in the mind of the defendant during the exam. Thank you. Thank you. Good morning, Your Honors. I'm Benjamin Block on behalf of the United States. I'd like to begin by just pointing out that I think that the appellant's emphasis on the fact that a mobile phone was used to access Kik, in this case, is perhaps misplaced. The IP address that was provided by Kik, all three IP addresses, related to residential or commercial wireless networks, a Wi-Fi router, which somebody has in their home or a business operates on their premises. And so Mr. Hood's access of Kik services, which was a voluntary act on his part, the IP address only relates to the physical location of the network, not Mr. Hood's physical location per se. And so what you're dealing with is, as Your Honors have pointed out, very much like a phone number and a pen register, where you can identify a number, and the IP address is critical, and several courts have found this most recently, all worked out of the Second Circuit, that the IP address is basically the phone number by which an Internet service company provides information to its user. And so it's a voluntary request by the user to seek information from the application, and they must have the IP address to know where to send the information back to the user. So what Mr. Hood essentially did was utilize, in the case of the Oakwood Inn in Sanford, their public Wi-Fi and use their IP address to communicate with Kik and receive information from Kik. That was voluntary on his part. The IP address that Kik provided to the government, they then had to go find out which Internet service provider was assigned that IP address, contact that Internet service provider, find out what company or individual had leased that IP address, and that gave them the address of the Inn. Well, at that point, they still don't know what Mr. Hood's location was or who he was. So they then had to take the additional step of confirming Mr. Hood's relationship to that location, and they did that by going to the hotel, finding records that indicated that a Rusty Hood was an occupant of the hotel at that time. This is very basic standard police work. In other words, you're saying there's no personal item of Mr. Hood that is identifiable as to where it is from the information provided through Kik. Correct. The only way that that information becomes linked to Mr. Hood is through additional investigation that indicates that he was, in fact, at the hotel at that time. And similarly... So that's very different than Carpenter because the phone is assigned to the person who's being searched. Correct. And you have this exhaustive, and Carpenter emphasized this over and over again, that the issue with CSLI was that it was a comprehensive chronicle of a person's movements in their day-to-day life. And that's simply not true of an IP address. Even if Mr. Hood accessed Kik at the hotel, he then leaves the hotel, he goes wherever he goes, he ends up at work, he accesses it again from work, these are discrete incidents. It does not follow him around. And so that's truly different in kind from the nature of the information that was problematic in Carpenter. And even if he accessed Kik numerous, numerous times, that has never been the volume of information, has never been the basis for a Fourth Amendment interest. It's the nature of the information. And what we're talking about here is communication protocols, the basic building blocks of Internet communication, not location. It doesn't move with the defendant even though he was using a mobile device. And I think that's borne out by the fact that every circuit court to consider this issue has found that IP address information is basic subscriber info that doesn't have a Fourth Amendment interest. And that is true post-Carpenter. Conservatives out of the Fifth Circuit found post-Carpenter that IP address does not implicate privacy in the same way that CSLI did. So unless the court has further questions on that issue, I would turn to the polygraph question. And the polygraph question issue in this case can't be a facial challenge to the use of polygraph testing as sets of under-treatment unsupervised release. This court has decided that issue in York, and there's no basis to revisit it now. The question is whether this particular defendant's low intellectual functioning somehow provides a basis for the court to find a sort of a peremptory Fifth Amendment violation based on anticipated questions in a polygraph setting. And there's simply no basis for that. It's incredibly speculative. It's speculative. Before you get to that, just so I understand, and maybe York decided this issue, if so, you can explain that it did to me. The counsel makes the point that in the contract it's written in that the assertion of the self-incrimination right under the Fifth Amendment, in response to any question, can, I can't tell if he's saying can or will, constitute a termination event with respect to the treatment. And then he says that substantially increases the likelihood of revocation. And, therefore, from that combination of things, you could say that the contract itself is imposing a burden from the get-go. Does York address that issue? I believe that it does, and I think that that... York addressed the issue of whether the assertion of the right would be a termination event for the treatment. Well, not directly, but I think that interpreting the terms of supervised release and the treatment contract in the manner that's been suggested by Mr. Hood would be contrary to York. York says that a refusal to answer a polygraph or an assertion of the Fifth Amendment right cannot be the sole basis for revocation. It certainly could be a basis to terminate treatment. But if the record indicates that that substantially increases one's likelihood of having revocation of the supervised release, now, maybe the record doesn't show that. If it did show that, then wouldn't that be putting pressure on the Fifth Amendment right? Because you would know that in making that assertion of the right you were putting in jeopardy your supervised release. I think the record is not clear that termination of treatment would automatically result in... Well, I understand it wouldn't automatically, but is it a substantial factor in determining whether to revoke? I think it depends on all the circumstances surrounding the defendant's supervised release. And termination of treatment certainly may be a factor, but I think that you would have to speculate as to, would the probation officer receive revocation under those circumstances? Not what you think, Mr. Moore. What does the record show with respect to the effect of termination of treatment on the part of a person on the supervised release? Does it show anything? The record, I would have to review the treatment contract, but I'm not sure that the record says anything other than... The treatment contract deals with the effect of refusal to answer on the termination of treatment. But now I'm talking about the effect of termination of the treatment contract on the term of supervised release. That's not something you would normally expect to find in the treatment contract. That's something that's up to the probation department and the district court. Yes, I would have to review the terms of the supervised release again, but I believe that all that it says is that failure to complete sex offender treatment as recommended by the probation officer can be a basis for revocation. Can, so there will... Sorry. No, I was going to say that means there will be some cases, we may assume, in which it will result in a termination or revocation of supervised release. Yes, theoretically it could be the basis. And we don't know in advance what those cases will be. You say it depends on all the circumstances. So doesn't it follow from that that a warning of that consequence is required? Well... It may not be a Fifth Amendment requirement in the sense of resulting in a new criminal charge, but it is, in fact, a threat of heavier, or a possibility of heavier punishment. And doesn't that require a warning if the agreement to undergo the polygraph test is to be regarded as a voluntary one? In other words, it's a due process issue. I understand that. I believe that the warning is given in the sense that it is part of the conditions of supervised release, which the defendant is instructed on. So the defendant is aware of the consequences of failure to complete sex offender treatment. And the question of whether that would constitute a due process violation would require an actual... Start it the other way. But imagine that the rule is, and I know the record doesn't show this, at least with any clarity, that if you're terminated from the sex offender treatment, you automatically have your supervised release revoked. And suppose the record also showed that if you assert your Fifth Amendment right, you are automatically terminated from the sex offender treatment. York does not address that issue as I understand it. And it would seem that in that circumstance there would be a Fifth Amendment problem, wouldn't there? Well, I think a defendant under those circumstances, with those explicit conditions, could make an argument under... Fifth Amendment. Under York. Yeah. That it was a direct consequence of... Okay. So then all we're trying to figure out is how much does the record show how much of a consequence you are at risk of? Because from the perspective of the person who is subject to the condition, if there is some but unknown risk that any answer can be the thing that leads to the termination of the treatment, and some unknown but substantial enough risk that the termination will lead to the revocation, then in any instance when I'm asked the question, I have to think, gee, if I assert my Fifth Amendment right in response to that question, I'm jeopardizing the revocation, which is the due process problem. So although it's not as automatic as an example I'm giving, from a constitutional perspective, why is it not just as problematic? Well, I would say that it's no different... that what you're positing is no different in the polygraph context than it is in a simple meeting between the probation officer and the supervisee. The supervisee has an obligation to answer questions truthfully, and if they refuse to do so, then that could kick off a series of events that could lead to revocation. So I think... Well, that may be an argument for requiring warnings in conferences with a probation officer, but I'm not sure that it answers Judge Barron's question. Well, I suppose it depends on the nature of the warning that you're proposing, because there are warnings, and the record is clear on this, that the defendant is provided with a warning at the beginning, at the outset of the polygraph, that it is a voluntary test, and that he can terminate at any time. That's found at pages 107 and 117 of your notice. The relevant warning is that if he terminates it by asserting his Fifth Amendment right, he puts at risk having his supervised release revoked. And he's warned of that in the supervised release conditions. So he is on notice as to that. So if there are no further questions, we would ask that the Court affirm. Thank you. Your Honor, I believe the relevant provisions of the contract with the counseling agency are page 44 of our brief. It says, I am required to follow all of the conditions below. I understand that group members who have violated this contract may leave the group for significant or repeated violations. I understand I will be required to take a polygraph test within the first six months of treatment. I understand I may be required to take a maintenance polygraph after the initial test, the timing determined by my CPC clinician and my probation officer. I understand that any violations of this contract may result in suspension or termination from the program. There are no Fifth Amendment considerations discussed in the contract. There's no Fifth Amendment warning of the nature of Miranda given to a person who's taking the polygraph exam. They're told, do you understand this is voluntary? When, of course, it's not because they're compelled to be there.  So I think that there's a necessity of warning at the very least, Your Honor, but there's clear Fifth Amendment jeopardy and for this particular defendant in particular. Thank you.